

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

IRMA RUBALCABA,                       )    No. CV 13-7068-PLA
                                      )
              Plaintiff,              )
                                      )
       v.                             )    **MEMORANDUM OPINION AND ORDER**
                                      )
CAROLYN W. COLVIN,                    )
ACTING COMMISSIONER OF SOCIAL         )
SECURITY ADMINISTRATION,              )
                                      )
              Defendant.              )
_____)

**I.**

**PROCEEDINGS**

       Plaintiff filed this action on October 2, 2013, seeking review of the Commissioner's denial
of her application for Supplemental Security Income ("SSI") payments.  The parties filed Consents
to proceed before the undersigned Magistrate Judge on November 8, 2013, and November 18,
2013.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on February 18, 2015,
that addresses their positions concerning the disputed issues in the case.  The Court has taken
the Joint Stipulation under submission without oral argument.

/

/

## II.

## **BACKGROUND**

Plaintiff was born on May 19, 1971.  [Administrative Record ("AR") at 30, 263.]  She has past relevant work experience as a child monitor.  [AR at 30, 100.]

On March 8, 2007, plaintiff protectively filed an application for SSI payments, alleging that she has been unable to work since October 1, 2006.  [AR at 20, 263-69.]  The claim was denied initially and upon rehearing, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  [AR at 20, 137-48.]  After a hearing on June 30, 2009,[1] at which plaintiff appeared represented by an attorney and testified on her own behalf [AR at 68-106], an unfavorable decision issued on August 28, 2009.  [AR at 122-31.]  Plaintiff requested review by the Appeals Council and on August 4, 2011, the Appeals Council granted the request for review "under the substantial evidence provision" of the regulations, and issued a remand order vacating the hearing decision.  [AR at 133-35.]  The Appeals Council ordered the ALJ on remand to:  (1) "[g]ive further consideration to [plaintiff's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations"; (2) evaluate the treating, nontreating, and nonexamining source opinions, including the opinions of treating physicians Reyadh J. Michail, M.D., and Gilbert Rosales, M.D., and explain the weight given to such opinion evidence; (3) request the treating and nontreating sources, as appropriate, to provide additional evidence and/or further clarification of the opinions and medical source statements about what plaintiff can still do despite the impairments; and (4) if warranted by the expanded record, obtain supplemental evidence from a vocational expert ("VE") to clarify the effect of the assessed limitations on plaintiff's occupational base.  [AR at 134.]        On February 22, 2012, another hearing was held before the same ALJ, at which time plaintiff appeared represented by an attorney, and testified on her own behalf.  [AR at 57-64.]  The same VE who had testified at the previous hearing [AR at 99-104] also testified.  [AR at 61-64.]  On

---

[1]     An initial hearing was commenced on January 12, 2009, but was continued for plaintiff to obtain additional medical records.  [AR at 110-12.]

March 5, 2012, the ALJ issued a decision concluding that plaintiff was not under a disability from March 8, 2007, the date the application was filed. [AR at 20-31.] Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 15.] When the Appeals Council denied plaintiff's request for review on July 26, 2013 [AR at 1-5], the ALJ's decision became the final decision of the Commissioner. See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted). This action followed.

### III.

### STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.")

1  (citation omitted).

2

3                                   **IV.**

4                      **THE EVALUATION OF DISABILITY**

5          Persons are "disabled" for purposes of receiving Social Security benefits if they are unable

6  to engage in any substantial gainful activity owing to a physical or mental impairment that is

7  expected to result in death or which has lasted or is expected to last for a continuous period of at

8  least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

9  1992).

10

11 **A.    THE FIVE-STEP EVALUATION PROCESS**

12         The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

13 whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821,

14 828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must

15 determine whether the claimant is currently engaged in substantial gainful activity; if so, the

16 claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in

17 substantial gainful activity, the second step requires the Commissioner to determine whether the

18 claimant has a "severe" impairment or combination of impairments significantly limiting her ability

19 to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

20 If the claimant has a "severe" impairment or combination of impairments, the third step requires

21 the Commissioner to determine whether the impairment or combination of impairments meets or

22 equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404,

23 subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If

24 the claimant's impairment or combination of impairments does not meet or equal an impairment

25 in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

26 sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled

27 and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to

28

                                       4

1  perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a

2  prima facie case of disability is established.  Id.  The Commissioner then bears the burden of

3  establishing that the claimant is not disabled, because she can perform other substantial gainful

4  work available in the national economy.  Id.  The determination of this issue comprises the fifth

5  and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at

6  828 n.5; Drouin, 966 F.2d at 1257.

7

8  **B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

9          At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since

10  March 8, 2007, the application date.  [AR at 23.]  At step two, the ALJ concluded that plaintiff has

11  the severe impairments of scoliosis and rheumatoid arthritis.[2]  [Id.]  At step three, the ALJ

12  determined that plaintiff does not have an impairment or a combination of impairments that meets

13  or medically equals any of the impairments in the Listings.  [Id.]  The ALJ further found that plaintiff

14  retained the residual functional capacity ("RFC")[3] to perform sedentary work as defined in 20

15  C.F.R. § 416.967(a),[4] including lifting up to ten pounds occasionally and less than ten pounds

16  frequently; standing and/or walking a total of two hours of an eight-hour workday; sitting up to six

17  hours of an eight-hour workday; but no more than occasional climbing, balancing, stooping,

18  kneeling, crouching, or crawling; and no overhead work with the left (non-dominant) upper

19

20  [2]    In his 2009 decision, the ALJ found plaintiff had the severe impairments of spine scoliosis,
21  lower back pain, neck pain, and rheumatoid arthritis.  [AR at 125.]

22  [3]    RFC is what a claimant can still do despite existing exertional and nonexertional
23  limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
    three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which
24  the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149,
    1151 n.2 (9th Cir. 2007) (citation omitted).

25  [4]    "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting
26  or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined
    as one which involves sitting, a certain amount of walking and standing is often necessary in
27  carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and
    other sedentary criteria are met."  20 C.F.R. § 416.967(a).

28

extremity.[5]  [Id.]  At step four, based on plaintiff's RFC and the testimony of the VE at the 2009 hearing [see AR at 31, 99-104],[6] the ALJ concluded that plaintiff is unable to perform any of her past relevant work as a child monitor.  [AR at 30, 100.]  At step five, based on plaintiff's RFC, vocational factors, and the VE's previous testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as a "bench assembler" (Dictionary of Occupational Titles ("DOT") No. 739.687-182), and "telephone information clerk" (DOT No. 237.367-043). [AR at 31, 100-01.]  Accordingly, the ALJ determined that plaintiff was not disabled since March 8, 2007, the date the application was filed.  [AR at 31.]

# V.

# THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he:  (1) rejected the opinions of plaintiff's treating physicians, Dr. Rosales, Dr. Michail, and Dan La, M.D.; (2) determined plaintiff's credibility; (3) failed to properly consider the combined effects of plaintiff's impairments when determining her RFC; and (4) relied upon the VE's testimony because the determined RFC did not include all of plaintiff's impairments.  [Joint Stipulation ("JS") at 4.][7]

As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

/

---

[5]   This is the same RFC determination made by the ALJ in his 2009 decision.  [Cf. AR at 126.]

[6]   At the 2012 hearing, although plaintiff's counsel presented the VE with several hypotheticals based on Dr. Rosales' opinions [see AR at 62-64], other than to seek clarification of counsel's hypotheticals [see, e.g., AR at 62, 63], the ALJ did not otherwise present the VE with any additional hypotheticals or questions.  [Id.]

[7]   Because the parties did not include page numbers, for ease of reference the Court will refer to the ECF-generated page numbers when referring to the JS.

## A.    MEDICAL OPINIONS

### 1.    Legal Standard

"There are three types of medical opinions in social security cases:  those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Lester, 81 F.3d at 830; Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan, 528 F.3d at 1198; Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830; Ryan, 528 F.3d at 1198.

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons."  Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012.  The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, 157 F.3d at 725.  The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct."  Id.

Although the opinion of a non-examining physician "cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," state agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."  20 C.F.R. §§

404.1527(f)(2)(i), 416.927(f)(2)(i); Soc. Sec. Ruling ("SSR")[8] 96-6p; Bray v. Astrue, 554 F.3d 1219, 1221, 1227 (9th Cir. 2009) (the ALJ properly relied "in large part on the DDS physician's assessment" in determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the claimant's functional limitations).  Reports of non-examining medical experts "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it."  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

### 2.    Dr. Altman and Dr. Sohn

#### a.    Background

On May 8, 2007, consultative medical examiner Jeff Altman, M.D.,[9] examined plaintiff in connection with her March 8, 2007, SSI application.  [AR at 25, 403-07; see also AR at 127.] Plaintiff complained to Dr. Altman of pain from her neck down to her legs, more on the left, and lower back pain. [AR at 403.]  Dr. Altman noted that plaintiff had received two epidurals in the past that did not help her pain, and that she was not receiving treatment at that time but was taking medication to help with her symptoms. [AR at 404.]  Dr. Altman noted plaintiff's very poor posture, as well as her overall "minimal motion" of her cervical spine,[10] limited range of motion of her

---

[8]    SSRs do not have the force of law.  Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

[9]    Dr. Altman is Board Eligible in Physical Medicine and Rehabilitation. [AR at 407.]  At the hearing, plaintiff's counsel objected to Dr. Altman's qualifications as a consultative examiner in this case because he is not an orthopedic doctor, is only board eligible, did not review the medical records after 2007, and because his evaluation was five-years old at the time of the hearing in February 2012.  [AR at 64.]  The ALJ overruled the objection.  [Id.]

[10]    Dr. Altman reported the following cervical range of motion results (reported as result/normal):  extension 10/30; right rotation 20/80; left rotation 20/80; right and left bending 40/40; and chin to chest flexion normal.  [AR at 405.]

thoracolumbar spine[11] and left shoulder;[12] "*significant* spasms in the sternocleidomastoid as well as in the paraspinals and the trapezius"; and slight tenderness to palpation of the lower lumbar paraspinals. [AR at 405-06 (emphasis added).] He found plaintiff's straight leg raising "went to about 60 degrees bilaterally in the supine position." [AR at 406.] Dr. Altman also found some tenderness over the anterior shoulder, but "otherwise . . . good grip strength," and noted that plaintiff's range of motion of the elbows, wrists, hands, hips, knees, ankles, and feet were otherwise within normal limits. [Id.] Dr. Altman concluded that plaintiff had some mild degenerative changes in the lumbar spine and evidence of spasm in the cervical region, and a possible torticollis.[13] [AR at 407.] He opined that plaintiff can push, pull, lift, and carry twenty pounds occasionally and ten pounds frequently; can walk and stand for four hours in an eight-hour workday; can do postural activities on a frequent basis; can do agility activities on an occasional basis; can sit for six hours in an eight-hour workday; does not need an assistive device; use of her hands for fine and gross manipulative movements is unlimited for the right hand and to a frequent level on the left; and she should avoid any overhead activities on the left side. [Id.] Despite the "minimal" range of motion he found in plaintiff's cervical spine (see supra n.10), and the possible torticollis, Dr. Altman did not posit any limitations for neck movements.

On May 24, 2007, the non-examining state agency physician, M. Sohn, M.D., completed a Physical Residual Functional Capacity Assessment. [AR at 415-19.] Dr. Sohn's "report" consisted entirely of checked boxes without supporting explanation, other than a recitation of Dr. Altman's findings. [Id.] He found plaintiff could lift and carry ten pounds frequently, twenty pounds

---

[11]   Dr. Altman reported the following thoracolumbar range of motion results (reported as result/normal): flexion 30/90; extension 10/20; right bending 10/25; left bending 10/25. [AR at 405.]

[12]   Dr. Altman reported that flexion and abduction of the left shoulder was about 60 degrees. [AR at 405.]

[13]   Torticollis, or "wry neck," is a disorder that exhibits "flexion, extension, or twisting of muscles of the neck beyond their normal position. In torticollis, the neck tends to twist to one side, causing head tilt." http://www.emedicinehealth.com/torticollis (last visited March 1, 2015).

occasionally; stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; could occasionally climb, balance, stoop, kneel, crouch, and crawl; was limited in her ability to reach overhead or above shoulder level with her left arm/hand; and could frequently work with her left arm or hand at or below shoulder level. [Id.] Dr. Sohn stated that in arriving at his conclusions he relied on plaintiff's pain questionnaire and Dr. Altman's May 8, 2007, orthopedic consultative examination, noting that Dr. Altman had found normal gait; decreased range of motion of the cervical and thoracolumbar spine, and the left shoulder; negative straight leg raising;[14] normal range of motion in other joints; neurological examination findings within normal limits; and a history of treatment for neck pain and lower back pain. [AR at 419.] There is no indication that other than Dr. Altman's report, Dr. Sohn reviewed any other of plaintiff's medical records from before May 2007.

### b.    Analysis

First, without ever stating the weight he actually gives to the opinions of the state agency consultants, the ALJ states that the "probative value" of Dr. Altman's opinion was enhanced by the fact that it was consistent with the May 24, 2007, opinion of the reviewing consultant, Dr. Sohn, who "reviewed the documentary evidence and similarly assessed [plaintiff] as capable of performing a restricted range of light work." [AR at 27 (citing AR at 415-19).] That these reports were consistent with each other is hardly surprising since the only "documentary" medical report reviewed by Dr. Sohn was the one completed by Dr. Altman -- who himself stated that he had reviewed only a left shoulder x-ray, an MRI of the lumbar spine, and a "note" from Imad Rasool, M.D., at Northridge Pain Management Specialists, stating plaintiff had a CT of the cervical spine showing cervical dextroscoliosis and mild spondylosis. [AR at 403.] The opinion of an examining physician who examined plaintiff only once, and a reviewing physician who merely checked boxes

---

[14]    This finding is incorrect -- Dr. Altman found negative straight leg raising only from a sitting position (90/90). [AR at 406.] He found positive straight leg raising at 60/90 degrees bilaterally from a supine position. [Id.] Thus, Dr. Sohn's opinion is not fully consistent with Dr. Altman's opinion and also misstates that opinion.

1  without giving supporting explanations, "are insufficient to outweigh the opinion of a treating

2  physician who cared for [plaintiff] over a period of time and who provided an opinion supported by

3  explanation and treatment records." Holohan v. Massanari, 246 F.3d 1195, 1207 (9th Cir. 2001).

4  This insufficiency is compounded here, where the consulting examiners' opinions were formulated

5  several years prior to those of the treating physicians.  As such, these reports are little more than

6  a "snapshot" assessment of plaintiff's condition at the point in time in 2007 that she presented to

7  Dr. Altman for his examination.  See Rodriguez v. Colvin, 2014 WL 5305722, at *2 (C.D. Cal. Oct.

8  15, 2014) (holding that where plaintiff's condition was such that her symptoms would wax and

9  wane, "the results of a single examination by a consultant cannot stand as substantial evidence,

10  for they reveal only what took place on that date," and noting that "if ever there was value to the

11  notion of relying on a longitudinal relationship -- the kind a treating physician enjoys with his

12  patient, and one reason that opinions of treating physicians are given greater weight than opinions

13  of consultants . . . it is with a disease that manifests itself differently over time") (citing Garrison,

14  759 F.3d at 1017).

15         The ALJ also found that the opinions of Dr. Altman and Dr. Sohn were not only consistent

16  with each other, but also "with the preponderance of the objective medical findings of record." [AR

17  at 27.]  In support, the ALJ referred to a record from Providence Holy Cross Hospital dated March

18  28, 2005, which described plaintiff's chronic history of back problems, yet found that plaintiff

19  exhibited full motor strength (5/5), intact sensation, 2+ deep tendon reflexes, and a "good gait."

20  [Id. (citing AR at 349).]   The Court notes, however, that although this visit was apparently

21  documented in two pages [see AR at 349 ("Page 1 of 2")], the second page -- which typically might

22  include relevant clinical assessments of the back and musculoskeletal system [see, e.g., AR at

23  340], and the diagnostic impression, disposition, condition on discharge, and discussion [see, e.g.,

24  AR at 341] -- is not in the record.  Additionally, the remote date of this examination -- 2005 -- may

25  be a valid snapshot of plaintiff's condition on March 28, 2005, but as with Dr. Altman's examination

26  generally, renders it a less valid picture of plaintiff's impairments during the entire relevant period.

27

28

As additional support that Dr. Altman's and Dr. Sohn's opinions were supported by "the preponderance of the objective medical findings," the ALJ also referred to a June 2007 treating record from Dr. Rasool at Northridge Pain Management Specialists, which "similarly" to the March 28, 2005, record from Providence Holy Cross Hospital, noted that plaintiff had a "normal gait." [Id. (citing AR at 450).] Not mentioned by the ALJ, that same record also indicates that plaintiff had decreased "sensory" on the left, and paravertebral tenderness; referred to a March 22, 2007, MRI of the lumbar spine [AR at 396], which showed loss of disk height at L3-L4, indicative of degenerative disc disease; diagnoses of low back pain, lumbar disk degeneration, neck pain, and left upper extremity pain; and a change in medication plan. [AR at 450.] The ALJ also fails to mention other records from Northridge Pain Management from September 2006 through July 2007, which, although the handwritten portions are largely illegible, also clearly indicate such issues as abnormal gait [AR at 449]; reduced extension of the back [id.]; loss of disk height, which was "explained to [the patient] & her daughter in detail" [AR at 451]; myofacial pain syndrome [id.]; antalgic gait [AR at 452]; lumbar disk herniation [id.]; lumbar radiculopathy on the left [id.]; left shoulder pain [id.]; a January 2, 2007, x-ray of the left shoulder showing mild degenerative changes in the acromioclavicular joint [AR at 398]; stabbing back pain in the right lower back area [AR at 454]; insomnia [id.]; ambulation with hesitation, reduced speed and caution [AR at 451, 455]; hesitance with head range of motion [AR at 455]; tenderness to palpation over the left gluteal and pyriformis muscle area [id.]; a July 24, 2006, CT scan of the lumbar spine showing lumbar spondylosis with facet hypertrophy, disc space narrowing, and small marginal osteophytes [id.; see also AR at 401]; a July 24, 2006, CT scan of the cervical spine showing cervical dextroscoliosis and mild spondylosis [AR at 455; see also AR at 402]; and diagnoses of lumbar disc degeneration, protrusion, extrusion without myolopathy; low back pain, lumbago low back syndrome; facet J. syndrome; and cervicalgia, neck pain [id.]. Moreover, on July 11, 2006, Dr. Rasool noted *positive* straight leg raising "on the left side for sharp shooting pain down the left

leg."[15] [AR at 395.] Plaintiff also received at least two epidural injections from this facility. [AR at 387, 391.] Thus, the ALJ's reliance on these two records as support for the "probative value" given to Dr. Altman's and Dr. Sohn's opinions, and for his own RFC determination, is misplaced, as these two records are *not* a reflection of "the preponderance of the objective medical findings" even up to 2007 and, therefore, under the circumstances of this case, do not constitute substantial evidence.

Based on the foregoing, substantial evidence does not support the opinions of Dr. Altman and Dr. Sohn and the ALJ erred in assessing their "probative value" and according them more weight than the opinions of plaintiff's treating physicians.

### 3.   Dr. Rosales

#### a.   Background

On June 22, 2009, Dr. Rosales, plaintiff's treating physician from June 2009 to February 2012, provided a medical source opinion on an eight-page form. [AR at 528-35.] He indicated he had first seen plaintiff on May 6, 2009, and that his most recent examination of her was on June 2, 2009. [AR at 528.] Dr. Rosales diagnosed plaintiff with rheumatoid arthritis, chronic lower back pain, spine scoliosis, and chronic neck pain with cervical spine radiculopathy. [Id.] He identified the "positive clinical findings" supporting his opinions as laboratory values from May 6, 2009, including "Rheumatoid Factor 18.5 High" (normal is 0-13.99) [see AR at 545], ESR (erythrocyte sedimentation rate) of 59 (normal is 0-20) [see id.], and a C-reactive protein test result of 93 (normal is 0-5) [see id.];[16] cervical spine x-rays taken on June 4, 2009, which showed degenerative disease; and x-rays of the lumbar spine taken on June 4, 2009, which showed scoliosis and

---

[15]   In his 2007 report, Dr. Altman also noted positive straight leg raising *bilaterally* at 60 degrees (a fact ignored by Dr. Sohn and the ALJ). [AR at 406; see also supra n.14.]

[16]   The Court notes that a December 21, 2006, lab report also showed an abnormally high level of ESR (60), and a positive C-reactive protein test result. [AR at 495-96.] It does not appear that rheumatoid factor was assessed at that time. [Id.] A June 27, 2008, report also showed an abnormally high ESR (67). [AR at 504.] It does not appear that plaintiff was tested on that date for rheumatoid factor or C-reactive protein. [Id.]

narrowing at L4-L5.   [Id. (citing AR at 538-39, 545-46).]  Dr. Rosales stated that on physical examination plaintiff's cervical spine showed decreased range of motion and tenderness; her lumbar spine showed a "significantly decreased" range of motion and tenderness; and her gait was wide based and she was walking with the aid of a walker.  [AR at 528-29.]  He described plaintiff's primary symptoms as neck pain radiating to her bilateral upper extremities, and lower back pain radiating to her bilateral lower extremities.  [AR at 529.]  He stated that plaintiff's pain in her neck and lower back was severe and constant with periods of exacerbation during the day, 9 on a scale of 10 in intensity, associated with fatigue, and worsened when doing daily activities.  [AR at 529-30.]  Dr. Rosales opined that as a result of plaintiff's impairments, plaintiff can sit for one hour, and stand or walk up to one hour during an eight-hour workday.  [AR at 530.]  She can not sit continuously in a work setting, and would need to get up and move around "as needed" to relieve her pain.  [AR at 530-31.]  She is not able to stand/walk continuously; can never lift or carry even up to five pounds; has significant limitations in repetitive reaching, handling, fingering, or lifting due to weakness in her bilateral upper extremities; has a moderate degree of bilateral limitation for grasping, turning, or twisting objects, and using her fingers/hands for fine manipulations; and has marked limitation in using her arms for reaching, including overhead.  [AR at 531-32.]  He noted that plaintiff would not be able to keep her neck in a constant position; her pain, fatigue or other symptoms would frequently interfere with her attention and concentration; her impairments are expected to last at least twelve months; she is not a malingerer; she is capable of tolerating low work stress; she would sometimes need to take unscheduled breaks during an eight-hour day to relieve her pain; she would have good days and bad days; she requires "ready access to a restroom"; and she is unable to push, pull, kneel, bend, or stoop, and should avoid stairs.  [AR at 532-34.]  Dr. Rosales noted that rheumatoid arthritis may cause immunodeficiency, and that a formal rheumatology consultation was pending as well as further imaging studies and modification in treatment.  [AR at 534.]   On July 11, 2011, Dr. Rosales prepared a note stating that he had been treating plaintiff for rheumatoid arthritis, ankylosing spondylitis, and chronic low back pain, and that she was "currently under treatment with a Rheumatologist."  [AR at 550.]

In a February 7, 2012, letter, Dr. Rosales updated his previous assessment.  [AR at 581.]  He noted that his observations and limitations as stated in the June 22, 2009, questionnaire "remain unchanged."  [Id.]  After reciting those limitations, he stated that plaintiff's "impairments are ongoing," leading him to expect they would last at least another twelve months.  [Id.]

The ALJ gave the opinions of Dr. Rosales "relatively little weight."  First, he noted that "[a] review of [Dr. Rosales'] treatment records reveals that the only abnormal clinical findings consistently reported by Dr. Rosales have been decreased range of motion and tenderness of the lower back."  [AR at 28.]  Then, reviewing Dr. Rosales' June 22, 2009, questionnaire, the ALJ stated:

> In support of his assessment, Dr. Rosales indicated a number of things that are at odds with the other evidence of record.  For example, he indicated the claimant had neck pain radiating to the bilateral upper extremities and lower back pain radiating to both legs.  Yet, this is inconsistent with what the claimant has actually reported in the treatment context and/or alleged in this case.  Dr. Rosales also indicated that the claimant had "weakness in the bilateral upper extremities."  Yet, as previously discussed, the claimant has consistently been found to have full strength in all four extremities.
>
> Similarly Dr. Rosales assessed a number of limitations for which there is no substantial support from the other evidence of record.  For example, the medical evidence shows no reason for restricting the claimant's use of her hands and fingers bilaterally, as indicated by Dr. Rosales.  Similarly, there is no explanation or other support in the record for Dr. Rosales' indication that the claimant would need a job permitting ready access to a restroom.  Thus, the basis for the rather extreme limitations assessed by Dr. Rosales is dubious.  The probative value of Dr. Rosales' opinion is further diminished by his lack of familiarity with the claimant, since his treatment of her admittedly had just begun only a month before the foregoing assessment was provided.

[Id. (citations omitted).]  The ALJ also discussed Dr. Rosales' 2012 opinion:

> However, as discussed above, the medical evidence shows no clear clinical indication of rheumatoid arthritis (e.g., joint swelling), only mild scoliosis, and no evidence of cervical radiculopathy.  Thus the basis of Dr. Rosales' opinion remains questionable.  Furthermore, a review of the actual treatment records (upon which his opinion purports to be based) reveals that the claimant did not see Dr. Rosales for anything but minor issues (e.g., cough, sore throat) between September 2009 and August 2010.  In August 2010, she complained primarily of flank pain, as opposed to the allegedly disabling neck, back, or arm pain.  In October 2010, she followed up for flank pain but made no mention of any of the allegedly disabling musculoskeletal problems.  In November 2010, she reportedly indicated that her low back pain had improved with Remicade treatment.  Thereafter, the claimant did not return to see Dr. Rosales for half a year except to complain of a runny nose in February 2011.  At her return visit in May 2011, Dr. Rosales noted only that the claimant's back pain was continuing, and that -- as previously noted -- she had

decreased range of motion and tenderness of the lumbosacral spine, but no other abnormalities. This evidence is at odds with the degree of limitation Dr. Rosales has assessed.

Finally, on a prescription paper dated February 21, 2012 (received at the hearing), Dr. Rosales wrote "walker necessity" and further stated that "[the claimant] has a lower back condition (ankylosing spondylitis) [and is] using a walker." The undersigned notes that, at her initial visit with Dr. Rosales in May 2009, the claimant did claim that she had started using a walker for mobility 12 months earlier because of "knee locking." However, the claimant's report in this regard is questionable, since her stated reason for using the walker (i.e., knee locking) is not typical for the impairments which are documented by medical findings in this case. Moreover, if the claimant were regularly using a walker as reported, then one might reasonably expect to see some corroboration of this in the progress notes. Yet, none of the progress notes received from the various treatment sources show any indication after mid-2009 that the claimant ever presented for treatment using a walker or any other assistive device(s). The undersigned notes that the most recent progress note from Dr. Rosales is from January 2012, and it identifies no clinical abnormalities whatsoever. On the contrary, it indicates that on examination Dr. Rosales found that the claimant had "no scoliosis" and "full range of motion" of the extremities. These normal findings are at odds with the preponderance of the other findings of record, which consistently indicate that the claimant does in fact have scoliosis and limited range of motion of the left upper extremity. As such, they are assigned little probative value. Nevertheless, the extent to which the findings reported by Dr. Rosales in January 2012 depart from the other evidence of record provides further indication that the information by Dr. Rosales generally may be less than fully reliable.

[AR at 29-30 (citations omitted) (alterations in original).]

###        b.      Analysis

With regard to the opinions of Dr. Rosales, a review of the record show that the ALJ's

statement that "the only abnormal clinical findings consistently reported by Dr. Rosales have been

decreased range of motion and tenderness of the lower back" [AR at 27 (citing AR at 537-46, 550-

76)], is not accurate. Dr. Rosales clearly indicated that his opinion was based in part on May 2009

laboratory test result values that were indicative of rheumatoid arthritis, cervical spine x-rays that

were consistent with degenerative disease, and lumbar spine x-rays showing scoliosis and

narrowing at L4-L5. [AR at 528.] On September 2, 2009, Dr. Rosales reviewed July 29, 2009, lab

results prepared at the request of Dr. La [AR at 569], which showed plaintiff's ESR had gone up

from 59 to 78, her rheumatoid factor was 18 (previous was 18.5), and her C-reactive protein test

result was 47.16 (previous was 93), all results still well above the normal range. [AR at 567 (citing

1    AR at 569-70).]   Thus, there are many abnormal clinical laboratory findings reported by Dr.

2    Rosales in addition to those referred to by the ALJ.

3         Moreover, the ALJ also states that "the medical evidence shows no clear clinical indication

4    of rheumatoid arthritis (e.g., joint swelling)."  [AR at 29.] This statement is puzzling since the ALJ

5    nevertheless determined that plaintiff *has* the severe impairment of rheumatoid arthritis.  And, the

6    ALJ points to no evidence that visible swelling in the cervical or lumbar spine areas is required to

7    support either a diagnosis of rheumatoid arthritis or the rheumatologist's additional diagnosis of

8    ankylosing spondylitis.   An ALJ may not render his own medical opinion or substitute his own

9    diagnosis for that of a physician.  Tackett v. Apfel, 180 F.3d 1094, 1102-03 (9th Cir. 1999) (ALJ

10   erred in rejecting physician's opinions and finding greater RFC based on claimant's testimony that

11   he took a road trip; there was no medical evidence to support the ALJ's determination); see also

12   Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (internal citation and quotation marks omitted)

13   (ALJ cannot arbitrarily substitute his own judgment for competent medical opinion).

14        The ALJ also stated that Dr. Rosales' findings of radiating neck and lower back pain, and

15   weakness in the bilateral upper extremities, are inconsistent with what plaintiff has reported and/or

16   alleged, and with the fact that plaintiff has "consistently been found to have full strength in all four

17   extremities."  [AR at 28.]   In fact, the reports the ALJ appears to be referring to -- the ones

18   indicating that plaintiff had full motor strength in all four extremities -- were a report from

19   Providence Holy Cross Hospital *on March 28, 2005* [see AR at 349]; and examining physician Jeff

20   Altman, M.D.'s *May 2007* report [see AR at 406-07].  The ALJ does not appear to take into

21   account that at the time plaintiff saw Dr. Rosales in 2009 and reported radiating pain, several

22   years had passed since these prior examinations.  He also does not account for the fact that at

23   her examination with Dr. Altman, regardless of her assessed motor strength, plaintiff reported to

24   Dr. Altman that she has pain "from the neck down to the legs." [See AR at 403.]  Thus, the ALJ's

25   findings in this regard are incomplete and misleading.

26        Similarly, the ALJ's finding that Dr. Rosales' limitation restricting plaintiff's use of her hands

27   and fingers was unsupported by other evidence in the record [AR at 28], is also inaccurate.  In

28

1    fact, Dr. Altman also indicated that plaintiff was limited to "frequent" fine and gross manipulative

2    movements of her left hand.  [AR at 407.]

3        Based on the foregoing, the ALJ's reasons for discounting the opinions of Dr. Rosales are

4    not specific and legitimate or supported by substantial evidence.

5

6        **4.    Dr. La**

7            **a.    Background**

8        Dr. La, a board-certified rheumatologist [AR at 16], was plaintiff's treating rheumatologist

9    between 2009 and 2012 [AR at 583-90.]  On a July 29, 2009, laboratory report, Dr. La wrote that

10   the test results showed "[c]lassi[c] Ankylosing Spondylitis."[17]  [AR at 571.]  Dr. La's note also

11   stated that he planned to start plaintiff on SSZ (sulfasalazine [see, e.g., AR at 561]), and "will

12   consider Remicade if not better."  [AR at 571.]  On November 3, 2009, in a follow-up examination

13   note, Dr. La indicated his diagnosis of ankylosing spondylitis, stated that plaintiff still had stiffness

14   in her thoracolumbar spine, and still felt fatigued.  [AR at 589-90.]  He noted decreased spinal

15   mobility secondary to her ankylosing spondylitis.  [AR at 589.]  Plaintiff reported that she felt "30%

16   better [with] SSZ" but that she still has pain in the "back, T-spine at night, very fatigued, stiff at

17   night," and that she also was experiencing pain in the right hip and knee.  [Id.]  As a result, Dr. La

18   increased plaintiff's SSZ dosage from 1000 mg per day to 2500 mg per day.  [AR at 589, 590.]

19   He again stated that he would consider treating her with Remicade injections if her symptoms

20   increased despite the increased dose of SSZ.  [AR at 590.]  Dr. La's records indicate that at least

21   between September 2011 and February 2012 plaintiff was being treated with Remicade injections,

22   implying that at some point her symptoms had not been alleviated by the increased dose of SSZ.

23   [See, e.g., AR at 583, 586-88.]  Laboratory test results ordered by Dr. La and dated February 3,

24   2012, show that plaintiff's C-reactive protein was still high, although her ESR rate was now within

25   the normal range at 15.  [AR at 585.]  On July 7, 2011, Dr. La prepared a note stating that plaintiff

26

27       [17]   The laboratory results included elevated levels of rheumatoid factor (18), C-reactive protein
     (47.16), ESR (78), and HLA-B27 (detected).  [AR at 569-71.]

28

1   "has Ankylosing Spondylitis on treatment with Remicade.  She is disabled due to joint pains." [AR

2   at 548.]

3

4           **b.    Analysis**

5         The ALJ discounted Dr. La's opinions based in part on the ALJ's finding that there was "no

6   evidence of further treatment provided by Dr. La for almost two years" after plaintiff's November

7   2009 visit, i.e., until September 2011, at which time plaintiff began receiving Remicade treatments

8   every one to two months.  [AR at 27.]  However, the Court notes that on June 22, 2009, Dr.

9   Rosales indicated plaintiff had been referred for a formal rheumatology consult [AR at 534; see

10   also May 21, 2009, treatment note indicating the same], and on the following dates Dr. Rosales

11   also reported that plaintiff was being prescribed SSZ:  September 2, 2009 [AR at 567]; November

12   10, 2009 [AR at 564]; April 14, 2010 [AR at 561]; and November 9, 2010 [AR at 555].   On

13   November 9, 2010, and again on May 2, 2011, Dr. Rosales' treatment notes indicated that plaintiff

14   was to have a Remicade injection in six weeks.  [AR at 552, 555.]  And, Dr. La's July 7, 2011, note

15   indicated that as of that date, plaintiff was being treated with Remicade.  [AR at 548.]  Thus, it

16   seems that Dr. La's treatment of plaintiff with SSZ continued throughout 2009 and 2010, and that

17   he may have started plaintiff's Remicade injections as early as November or December 2010.

18   These records also imply that at least as of September 2, 2009, plaintiff was being treated by Dr.

19   La and that Dr. La's September 2009 through September 2011 treatment records for some reason

20   have not been included in the Administrative Record.

21         The ALJ also stated that "it does not appear that Dr. La examined [plaintiff] on any of these

22   occasions, since the treatment records are devoid of any clinical findings."  [Id. (citing AR at 583-

23   88.]  As previously noted, however, Dr. La ordered at least two laboratory reports during the time

24   he was treating plaintiff.  [See, e.g., AR at 569-71 (July 29, 2009), 584-85 (February 3, 2012).]

25         The ALJ also discounted Dr. La's diagnosis of ankylosing spondylitis because although

26   plaintiff "had a positive HCA B27 antigen" test result, Dr. La "simultaneously noted that the

27   claimant had no joint swelling, and a negative straight leg raise test."  [AR at 27 (citing AR at 589).]

28

1   What the ALJ fails to mention is that although the straight leg raise test was negative, it appears

2   Dr. La indicated that plaintiff's lumbosacral flexion, extension, and lateral flexion were all positive.

3   [See AR at 589.]  Moreover, as discussed above, the ALJ points to no evidence that visible

4   swelling in spinal areas is required to support Dr. La's diagnosis of ankylosing spondylitis, and he

5   may not render his own medical opinion or substitute his own diagnosis for that of a physician.

6   Tackett, 180 F.3d at 1102-03.

7          With regard to Dr. La's July 2011 note, the ALJ remarked that "whereas Drs. Altman and

8   Sohn are familiar with the disability program, it is unclear whether Dr. La knows the definition of

9   'disability' as defined under the Social Security regulations."  [Id.]  The ALJ determined, therefore,

10  that "the opinion provided by Dr. La is not a specific assessment of the nature and severity of

11  [plaintiff's] impairments, but rather a conclusion on an issue reserved to the Commissioner . . .

12  [and] not entitled to any special significance."  [Id.]

13         While the ultimate determination of whether plaintiff is disabled is an issue reserved to the

14  Commissioner, the Social Security "rules provide that [ALJs] must always carefully consider

15  medical source opinions about any issue, including opinions about issues that are reserved to the

16  Commissioner." SSR 96-5p, 1996 WL 374183, at *2.  An ALJ must consider a treating physician's

17  opinion on the ultimate issue of disability as he would consider a treating physician's medical

18  opinion, and "if controverted, [it] can be rejected only with specific and legitimate reasons

19  supported by substantial evidence in the record." Reddick, 157 F.3d at 725; see SSR 96-5p, 1996

20  WL 374183, at *3 ("[O]pinions from any medical source on issues reserved to the Commissioner

21  must never be ignored.  The adjudicator is required to evaluate all evidence in the case record that

22  may have a bearing on the determination or decision of disability, including opinions from medical

23  sources about issues reserved to the Commissioner.").

24         Based on the foregoing, the ALJ's reasons for discounting the opinions of Dr. La are not

25  specific and legitimate or supported by substantial evidence.

26      **5.     Dr. Michail**

27         Dr. Michail was one of plaintiff's treating physicians for a three-year period between 2006

28

20

and 2009.  [AR at 27.]  On March 6, 2009, Dr. Michail completed a form addressing plaintiff's "physical capacities."  [AR at 464-65.]  He indicated that plaintiff could stand or walk for 0-2 hours in an eight-hour workday; sit for 0-2 hours at one time; could occasionally lift/carry up to ten pounds and was unrestricted in the use of her hands/fingers; could occasionally reach to her knees; and could never climb, balance, stoop, kneel, crouch, crawl, or reach below her knees. [Id.]  He stated that her treatment and/or medications might affect her ability to work.  [AR at 465.] In a "Statement of Provider" form completed on the same day, Dr. Michail indicated that commencing in July 2007 plaintiff had a medically verifiable chronic condition that would limit or prevent her from performing certain tasks; is actively seeking treatment; is unable to work; and that her conditions would "require someone to be in the home to care" for her.  [AR at 462.]

The ALJ gave Dr. Michail's opinions "little weight" because they "consist exclusively of box-checking and are wholly devoid of explanation, lacking even any reference(s) to medical diagnoses or findings to which the assessed limitations might reasonably refer," and, therefore, "the basis for the assessments . . . is unclear."  [AR at 27-28.]  After reviewing other evidence received from Dr. Michail, the ALJ noted that his opinion "may have been based, at least in part, on conditions not actually established in this case -- e.g., 'severe peripheral neuropathy' and 'possible multiple sclerosis.'"[18]  [AR at 28 (citing AR at 466).]  He also stated that "the extreme limitations assessed by Dr. Michail lack substantial support from the other evidence of record," including Dr. Michail's own progress notes "which reflect subjective complaints but few, if any, actual clinical findings."[19]  [Id.]  He noted that it was difficult to tell from the record whether Dr. Michail actually examined plaintiff.  [Id.]  Despite the "little weight" given to Dr. Michail's opinions, the ALJ noted that Dr. Michail's assessments regarding plaintiff's ability to lift up to ten pounds occasionally, and unrestricted use of her hands/fingers, actually provided "some additional support" for the RFC determination.  [Id.]

---

[18]   It is just as possible that Dr. Michail was attempting to rule out these disorders.

[19]   As Dr. Michail's treating notes are difficult to decipher [see, e.g., AR at 436-46, 471-92], the Court is hard-pressed to find support for this statement by the ALJ.

21

For the same reasons discussed relating to the opinions of Dr. Rosales and Dr. La, the ALJ's statement that Dr. Michail's limitations "lack substantial support from the other evidence of record," is not specific and legitimate or supported by substantial evidence.

### 6.    Conclusion

An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster his findings.  See, e.g., Holohan, 246 F.3d at 1207-08 (holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others); Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) ("[T]he [ALJ]'s decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'") (citing Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998)); see also Reddick, 157 F.3d at  722-23 (it is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports"); Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."); Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) ("[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.") (citation omitted).

That the May 2007 opinions of Dr. Altman and Dr. Sohn may be consistent with isolated findings from plaintiff's 2006 and 2007 treating records ignores the fact that, overall, plaintiff's treating records indicate that plaintiff's condition may have been deteriorating over time.  In fact, although the ALJ stated that he had considered the entire record [AR at 23], he failed to mention, much less address, many of plaintiff's treatment records.  [See AR at 12, 14.]  Nor did either Dr. Altman or Dr. Sohn, or any other consulting physician, have the benefit of reviewing plaintiff's more recent medical records, lab test results, and diagnoses, including Dr. La's diagnosis of ankylosing spondylitis.  In his effort to discredit the treating physicians and to find "probative value" in the 2007 reports of Dr. Altman and Dr. Sohn, the ALJ completely ignores what appears to be the longitudinal change in plaintiff's symptoms, despite the Appeals Council's instruction to consider

plaintiff's maximum RFC "***during the entire period at issue***." [See AR at 134 (emphasis added).]

Based on the foregoing, the ALJ's discounting of the opinions of plaintiff's treating physicians, and the "probative value" he assigned to the 2007 opinions of Dr. Altman and Dr. Sohn to support his finding that plaintiff has not been disabled since March 8, 2007, are not supported by substantial evidence of record and remand is warranted.

**B.      PLAINTIFF'S OTHER CLAIMS**

Plaintiff also contends that the ALJ (1) failed to articulate legally sufficient reasons for rejecting plaintiff's subjective symptom testimony; (2) failed to consider the combined effects of all of plaintiff's impairments; and (3) erred in relying upon the VE's 2009 testimony because the RFC did not include all of plaintiff's impairments or limitations.

For the same reasons discussed above, the Court agrees with plaintiff [see, e.g., JS at 47] and finds that in determining plaintiff RFC, the ALJ failed to properly consider the combined effect of all of plaintiff's impairments during the ***entire period at issue***, including her chronic pain, her significantly limited range of motion in her cervical spine, her limited range of motion in her lumbar spine, her weakness in the upper and lower extremities, her radicular pain, her use of a walker, and her diagnosis of ankylosing spondylitis.  As a result, the ALJ's hypothetical to the VE also was not complete.  Additionally, because the matter is being remanded for consideration of the medical record and these other issues, on remand the ALJ also must reconsider plaintiff's credibility, as the ALJ based his conclusion, at least in part, on plaintiff's allegations not being supported by the objective medical evidence of record.

/

/

# VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. See Lingenfelter v. Astrue, 504 F.3d 1028, 1041 (9th Cir. 2007); Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. See Benecke, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, the ALJ shall allow plaintiff to supplement the record with any new medical evidence. Second, the ALJ shall fully develop the record relating to plaintiff's physical impairments by ordering a new consultative examination or examinations, with the appropriate specialist(s). The consultative examiner(s) shall be provided with all of plaintiff's medical records. Third, the ALJ shall reassess the entire medical record, taking into account the opinions of Dr. Rosales, Dr. Michail, and Dr. La, all imaging and laboratory test results, the new consultative examination(s), and all other medical evidence of record relevant to plaintiff's claim for SSI payments for the entire period at issue. As appropriate, the ALJ may request the treating and nontreating sources to provide additional evidence and/or further clarification of their opinions and medical source statements about what the claimant can still do despite the impairments. The ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects, including a legally sufficient explanation for crediting one doctor's opinion over any of the others. Fourth, at the administrative hearing, the ALJ, if warranted, shall elicit the testimony of a medical expert to assist the ALJ in formulating a new RFC

determination.  Fifth, the ALJ shall reassess plaintiff's credibility and provide specific, clear and convincing reasons for discrediting her testimony, if warranted.  Sixth, based on his or her[20] reevaluation of the entire medical record, including the new consultative examination, the ALJ shall determine plaintiff's RFC.  Finally, the ALJ shall determine, with the assistance of a VE, whether plaintiff is capable of performing any other work existing in sufficient numbers in the regional and national economies.[21]

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  March 2, 2015

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[20]   Internal policy of the Social Security Administration provides that on remand from the Appeals Council, including remands generated by the Court, the proceedings are held before the previously assigned ALJ, unless the case previously was assigned to that ALJ on a prior remand and the ALJ's decision after remand is the subject of the new remand, or the Appeals Council expressly directs the case to be assigned to a different ALJ.  HALLEX I–2–1-55(D)(6).

[21]   Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to her past relevant work.